UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------X
                                       :

JURUPA VALLEY SPECTRUM, LLC,        :

                    Plaintiff,    :

                                         :    06 Civ. 4023 (DLC)

           -v-                     :

                                         :    <u>OPINION AND ORDER</u>

NATIONAL INDEMNITY COMPANY, NATIONAL  :
LIABILITY AND FIRE INSURANCE COMPANY   :

                                         :

                     Defendants.   :

                                         :
----------------------------------------X

Appearances

For Plaintiff:
Greg Hansen
Mark Garbowksi
Anderson Kill & Olick, P.C.
1251 Avenue of the Americas
New York, NY 10020

For Defendants:
Joseph G. Casaccio
Berkshire Hathaway Ins. Group
100 First Stamford Place, Suite 200
Stamford, CT 06907

Kevin G. Snover
816 Deer Park Avenue
North Babylon, NY 11703

DENISE COTE, District Judge:

     This Opinion addresses the issue of whether a beneficiary

of surety bonds may bring a cause of action for bond payments

against the reinsurer of the bond issuer.  Finding that the

plaintiff has failed to plead a direct cause of action to sue

the reinsurer either pursuant to the reinsurance agreement or

under New York Ins. Law §§ 1115 and 4118 ("Sections 1115 and
4118"), the defendants' motion to dismiss for failure to state a
claim is granted.

Plaintiff Jurupa Valley Spectrum, LLC ("Jurupa") holds
surety bonds issued by Frontier Insurance Company ("Frontier"),
an insolvent entity in rehabilitation under the direction of the
New York Insurance Department, Liquidation Bureau
("Department").  The defendants are National Indemnity Company
("NICO"), Frontier's reinsurer, and National Liability & Fire
Insurance Company ("National Liability"), NICO's claims
administrator.  Plaintiff claims that it has a cause of action
against NICO without joining Frontier, against whom all suits
are enjoined, on three grounds: (1) the reinsurance agreement
between Frontier and NICO both alone and in conjunction with
Sections 1115 and 4118, (2) Sections 1115 and 4118 alone, and
(3) NICO's assumption of Frontier's surety bond obligations.
Jurupa's fourth and final claim is that National Liability
intentionally interfered with NICO's performance of its
contractual obligations.  Jurupa seeks damages, interest,
expenses, and fees, including reasonable attorney fees.

NICO and National Liability move to dismiss pursuant to
Rule 12(b)(6), Fed. R. Civ. P., for failure to state a claim
upon which relief may be granted and pursuant to Rule 12(b)(7)
for failure to name Frontier as an indispensable party.  They

argue that 1) Jurupa lacks standing to bring a cause of action for breach of the reinsurance agreement; 2) NICO discharged its reinsurance obligations for Frontier surety claims; 3) Jurupa has no statutory cause of action under Sections 1115 and 4118, 4) National Liability cannot interfere with Jurupa's contract rights when no such rights exist; and 5) Frontier is an indispensable party to the action.  For the reasons set forth below, it is unnecessary to reach this last issue.

BACKGROUND

The following facts are undisputed or taken from the complaint and the documents attached to it, unless otherwise noted.[1]

A. The Construction Contract and Surety Bonds

Jurupa entered into a construction contract with Aaron Management, Inc. ("Aaron") on February 1, 1999, for Aaron to build a movie theater.  The parties secured the contract with two surety bonds -- a "performance bond" and a "payment bond."

---

[1] In support of its motion, the defendants submitted an affidavit from Joseph G. Casaccio, vice president and legal counsel for NICO and National Liability, with attached documents.  The parties contest whether the Casaccio affidavit may be considered in the instant motion.  To the extent that the Casaccio affidavit puts forth legal arguments, it has been disregarded. The issue of whether documents authenticated by the affidavit that were not attached to the complaint may be considered is treated below.

On March 17, Frontier executed the bonds, each in the amount of $6,285,000, with Aaron as principal and Jurupa as obligee.  The surety bonds stated that if Aaron failed to perform according to the construction contract, Frontier would become liable for the immediate payment to Jurupa of all amounts due or to become due under the construction contract.

Aaron defaulted under the construction contract on August 6.  On January 26, 2000, the plaintiff notified Frontier by letter of Aaron's defaults and demanded immediate payment of all money that remained due under the construction contract.  Frontier has not made any payment to date.  Jurupa sued Aaron in California Superior Court and obtained a default judgment on February 15, 2002.  Aaron has not paid the judgment due to a lack of funds.  On March 2, Jurupa sent Aaron a letter notifying it that the construction contract was formally terminated due to Aaron's lack of performance.


B. Reinsurance Agreement and Endorsement No. 1

Over a year after Frontier issued bonds protecting Jurupa, and months after Aaron defaulted on the construction contract, Frontier obtained reinsurance from NICO.  On June 6, 2000, the U.S. Treasury Department reported that Frontier lost its eligibility to provide surety bonds.  Thereafter, NICO and Frontier entered into a $490 million Aggregate Reinsurance

Agreement ("Reinsurance Agreement"), signed on September 27, 2000, and effective as of July 1, 2000.  Article 1 of the Reinsurance Agreement provided that NICO, the reinsurer, would pay policyholders and other claimants on "Covered Liabilities," defined as surety bonds issued by Frontier on or before December 31, 1999,[2] through a claims administrator.

> Reinsurer, through the Claims Administrator, shall pay on behalf of the Reinsured any and all Ultimate Net Loss in relation to Covered Liabilities subject to the terms, conditions, exclusions and Aggregate Limit stated in this Reinsurance. . . . [T]he parties to this Reinsurance intend that <u>Reinsurer, through the Claims Administrator, shall pay all amounts</u> of Ultimate Net Loss due Insureds and other persons as and when due directly on behalf of the Reinsured in accordance with Article 16.

(Emphasis supplied.)[3]  In the event of Frontier's insolvency, Article 12 of the Reinsurance Agreement provided that

> the reinsurance under this Contract shall be payable directly by the Reinsurer to the company or to its liquidator, receiver or statutory successor, <u>except as provided by Section 4118(a) of the New York Insurance Law or except</u> (1) where the Reinsurer with the consent of the direct insured or insureds <u>has assumed such policy obligations of the company as direct obligations of the</u>

---

[2] "Covered Liabilities" are defined in the Reinsurance Agreement as "all insurance and reinsurance obligations of [Frontier] incurred by [Frontier] during Accident Years 1999 and prior."

[3] According to the Reinsurance Agreement, the term "Ultimate Net Loss" refers to the "sums payable by the Reinsured as Covered Liabilities" on or after the effective date of the agreement, July 1, 2000, save any exclusions set forth in Article 3 of the agreement.  Article 16 preserves NICO's right to "associate in the handling of any claims, whether direct or reinsurance and commutations, both inwards or outwards, in connection with the business covered" by the Reinsurance Agreement.

> Reinsurer to the payees under such policies and in
> substitution for the obligations of the company to such
> payees.

(Emphasis supplied.)  Article 14 of the Reinsurance Agreement

explicitly refrained, however, from creating third party rights

for parties holding Frontier-issued surety bonds.

> Nothing in this Reinsurance, express or implied, is
> intended, or shall be construed to confer upon or give to
> any person, firm or corporation, (other than the parties
> hereto and their permitted assigns or successors) any
> rights or remedies under or by reason of this Reinsurance.

On January 5, 2001, NICO and Frontier entered into

Endorsement No. 1 to the Reinsurance Agreement ("Endorsement No.

1"), which amended the earlier agreement by providing that NICO

would reinsure "any subject surety bond in-force [sic] as of

December 31, 2000," regardless of when the loss under such bonds

was "deemed to have occurred, been reported or discovered."

Endorsement No. 1 further amended the Reinsurance Agreement by

obligating NICO to reimburse Frontier for the total amount of

"Covered Liabilities" remaining after reduction by other

reinsurance.


C. Frontier's Financial Deterioration and the Administration

Agreement

On February 13, 2001, a New York State Insurance Department

Examiner issued a "Report on Examination of the Frontier

Insurance Company as of December 31, 1999" ("Report").  This

Report found that on December 31, 1999, the company's policyholder surplus was negative in an amount in excess of $145 million.

Frontier, two of its subsidiaries, NICO, and National Liability entered into an Administration Agreement on March 9, 2001, which established National Liability as the administrator for claims governed by the Reinsurance Agreement and Endorsement No. 1.  The agreement permitted National Liability to delegate claims administration duties to Frontier, even as it retained ultimate responsibility for administering claims.

D. Endorsement No. 2 and Order of Rehabilitation

Frontier entered Rehabilitation when the Department took over control of Frontier due to its insolvency and lack of liquidity.  On September 20, NICO, National Liability, and Frontier's rehabilitator ("Rehabilitator"), acting on behalf of the company and the Department, entered into Endorsement No. 2 to the Reinsurance Agreement.  According to Endorsement No. 2, the Rehabilitator would "seek an order from the Supreme Court of the State of New York staying all actions against the Reinsured and staying all actions in which the Reinsured is obligated to defend a party" for the purposes of promoting Frontier's "orderly rehabilitation."  The agreement also provided that NICO

would make any payments to those insured by Frontier through the
Rehabilitator.

> Consistent with Article 12 of the Reinsurance Agreement,
> "Insolvency of the Reinsured," <u>all reinsurance payments</u>
> made by the Reinsurer during the rehabilitation of the
> Reinsured <u>shall be made directly to the Rehabilitator</u>,
> which shall make payments with such funds.  The
> Administrator and Reinsurer shall make no payments not
> within the terms of Article 12 or without the approval of
> the Rehabilitator.

(Emphasis supplied.)  The agreement placed authority for claims
settlement and collection in the Rehabilitator.
"Notwithstanding anything herein to the contrary, the Reinsured
and Rehabilitator individually and collectively agree that
ultimate authority for the settlement of claims and collection
of reinsurance shall remain with the Rehabilitator."

On October 15, the Supreme Court of the State of New York
entered an Order of Rehabilitation, which found that Frontier
was "insolvent" and had "failed to cure its impairment of
capital or minimum surplus to policyholders."  The Order of
Rehabilitation appointed the Superintendent of Insurance of the
State of New York as Frontier's Rehabilitator with authority to
"take possession of [Frontier's] property, conduct its business,
including but not limited to settling claims within his sole
discretion."  It also enjoined or restrained "[a]ll persons . .
. from commencing or prosecuting any actions, lawsuits, or

proceedings against Frontier, or the Superintendent as Rehabilitator."

E. Endorsement No. 3

Frontier and NICO entered into Endorsement No. 3 to the Reinsurance Agreement, effective January 1, 2004, which amended the Reinsurance Agreement, Administration Agreement, and the previous two endorsements.  In return for $190 million of consideration from NICO in the form of a $50 million payment and forgiveness of $140 million debt, Frontier commuted NICO's liability for surety claims on or after January 1, 2004.[4] According to the second paragraph of Endorsement No. 3,

---

[4] According to Paragraphs 7 and 8 of Endorsement No. 3, NICO would pay Frontier $50 million and forgive $140 million of Frontier's debt in exchange for a reduction in NICO's reinsurance obligation.  Paragraph 7 provides in pertinent part that

> [t]en days following approval of this agreement by the Rehabilitation Court in a final, non-appealable order, the Reinsurer shall pay the sum of $50 million to the Reinsured.  The Reinsurer's obligation to pay $50 million shall be reduced by the sum of all payments made by the Reinsurer after December 31, 2003 in excess of the Reinsurer's contractual obligations after December 31, 2003 pursuant to the Reinsurance Agreement as amended in this Endorsement No. 3.

Paragraph 8 of Endorsement No. 3 states that

> [w]ith effect from December 31, 2003, the Reinsurer releases the Reinsured from any and all obligation or liability with respect to repayment of $140 million of the NICO Balance.  To the extent that the NICO Balance is

Effective January 1, 2004, the <u>Reinsurer shall have no further obligation or liability whatsoever with respect to the Reinsured's surety business</u>, including but not limited to indemnity sums, allocated or unallocated expense or other costs, under the Reinsurance Agreement or otherwise. The "Covered Business" and "Covered Liabilities" shall not include the Reinsured's surety business.  <u>Frontier's surety bond claims will not be reinsured under the Reinsurance Agreement</u>.

(Emphasis supplied.)  Paragraph 13 of Endorsement No. 3 further provides that Frontier "shall release the Reinsurer from any and all claims related to the reinsurance in effect on December 31, 2003 except for the amended obligations as set forth in this Endorsement 3 [sic]."  The fifth paragraph of the agreement amended earlier agreements between the parties by providing that "[t]he Reinsurer shall have no administrative rights or obligations with respect to the handling of surety claims or the collection of reinsurance after December 31, 2003."  Finally, Endorsement No. 3 addressed the rights of third parties in Paragraph 14 as follows:

<u>The Reinsured shall hold the Reinsurer and Administrator harmless</u> and indemnify the Reinsurer and Administrator against any claims of third parties in respect of sums that would otherwise be recoverable under the reinsurance and the Administrative Agreement and this amendment of the reinsurance and Administrative Agreement, but this hold harmless and indemnification obligation shall not extend to claims against the Reinsurer or Administrator as tortfeasors.

---

greater than $140 million, the Reinsured shall pay to the Reinsurer that amount by which the NICO Balance exceeds $140 million.

(Emphasis supplied.)

Frontier's Rehabilitator filed a petition with the New York Supreme Court seeking ratification of a proposed agreement between NICO and Frontier in which NICO agreed to pay Frontier approximately $45 million and forgive approximately $145 million of Frontier's debt in exchange for a "reduction in NICO's reinsurance obligation."  Mills v. Florida Asset Finan. Corp., 818 N.Y.S.2d 333, 334 (App. Div. 2006).  The Supreme Court initially dismissed the petition, finding that a prior court order denying ratification of a prior agreement was the law of the case.  Id.  The Supreme Court later recognized the distinction between the two agreements, vacated its original decision, and granted the petition.[5]  Id.  The Appellate Division upheld the decision to ratify the agreement, finding that it was "essential to Frontier's rehabilitation."  Id. at 335.


DISCUSSION

As already noted, the defendants move to dismiss the complaint under Rule 12(b)(6) on the grounds that the plaintiff fails to state a cause of action against NICO or National

---

[5] According to the Casaccio affidavit, Jurupa opposed adoption of the agreement in the state court litigation.  While Jurupa complains in its briefs that the Casaccio affidavit may not be relied upon because its allegations are not based on personal knowledge and have not been verified or subject to discovery, it does not deny its participation.

Liability under common or statutory law.  They argue that 1)
Jurupa lacks the privity required to sue NICO under the
Reinsurance Agreement;[6] 2) NICO discharged its reinsurance
obligations for Frontier surety claims through Endorsement No.
3; 3) Sections 1115 and 4118 do not provide an independent cause
of action for Jurupa to sue the reinsurer of its surety bonds
absent express contractual language; and 4) Jurupa cannot state
a claim for tortious interference with a contract against
National Liability when it had no contractual relationship with
NICO.

---

[6] The defendants' moving brief frames this argument as one
attacking plaintiff's standing to sue NICO for breach of the
Reinsurance Agreement.  "Where, as here, jurisdiction is
predicated on diversity of citizenship, a plaintiff must have
standing under both Article III of the Constitution and
applicable state law in order to maintain a cause of action."
Mid-Hudson Catskill Rural Migrant Ministry, Inc. v. Fine Host
Corp., 418 F.3d 168, 173 (2d Cir. 2005).  Article III standing
requires that plaintiff has suffered an injury in fact that is
distinct, palpable and fairly traceable to the challenged
action.  See Denney v. Deutsche Bank AG, 443 F.3d 253, 263 (2d
Cir. 2006) (citing Lujan v. Defenders of Wildlife, 504 U.S. 555,
560-61 (1992)).  The requirements for standing under New York
law are similar to the requirements under Article III, including
the requirement of an injury in fact.  See Caprer v. Nussbaum,
825 N.Y.S.2d 55, 62-63 (App. Div. 2006).  The parties do not
contest that the plaintiff suffered an injury in fact with
regard to Aaron's default on the construction contract and its
subsequent inability to recover payments under the performance
and payment bonds.  The defendants' argument is therefore
construed as made pursuant to a Rule 12(b)(6) motion to dismiss
for failure to state a claim for breach of the Reinsurance
Agreement rather than a motion under Rule 12(b)(1), Fed. R. Civ.
P., to dismiss for lack of subject matter jurisdiction.

Under the pleading standard set forth in Rule 8(a) of the
Federal Rules of Civil Procedure, complaints must include "a
short and plain statement of the claim showing that the pleader
is entitled to relief."  Fed. R. Civ. P. 8(a)(2). "[A] plaintiff
is required only to give a defendant fair notice of what the
claim is and the grounds upon which it rests." <u>Leibowitz v.
Cornell Univ.</u>, 445 F.3d 586, 591 (2d Cir. 2006).  When
considering a motion to dismiss under Rule 12(b)(6), a trial
court must "accept as true all factual statements alleged in the
complaint and draw all reasonable inferences in favor of the
non-moving party." <u>McCarthy v. Dun & Bradstreet Corp.</u>, 482 F.3d
184, 191 (2d Cir. 2007) (citation omitted).  It may "dismiss a
complaint only if it is clear that no relief could be granted
under any set of facts that could be proved consistent with the
allegations" set forth therein. <u>Swierkiewicz v. Sorema N.A.</u>,
534 U.S. 506, 514 (2002) (citation omitted); <u>see also</u> <u>McCarthy</u>,
482 F.3d at 191.  At the same time, "conclusory allegations or
legal conclusions masquerading as factual conclusions will not
suffice to defeat a motion to dismiss." <u>Achtman v. Kirby,
McInerney & Squire, LLP</u>, 464 F.3d 328, 337 (2d Cir. 2006)
(citation omitted).

While the plaintiff attached to the original complaint many of the contracts integral to the allegations in the complaint,[7] it did not attach Endorsement No. 3.  The parties contest, therefore, whether the document may be considered on the instant motion.  In considering a motion to dismiss under Rule 12(b)(6), the court will deem the complaint to include "any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference." Mangiafico v. Blumenthal, 471 F.3d 391, 398 (2d Cir. 2006) (citation omitted). Even if the plaintiff does not attach to the complaint or incorporate by reference "a document upon which it solely relies and which is integral to the complaint, the court may nevertheless take the document into consideration in deciding the defendant's motion to dismiss, without converting the proceeding to one for summary judgment." Holowecki v. Fed. Express Corp., 440 F.3d 558, 565-66 (2d Cir. 2006) (citation omitted).  The necessity of transforming a Rule 12(b)(6) motion into a motion for summary judgment is "largely dissipated" when the plaintiff is shown to have had actual notice of the document extrinsic to the complaint and to have relied upon the document to frame the complaint.  Cortec Indus., Inc. v. Sum Holdings,

---

[7] The plaintiff attached to its original complaint the construction contract, performance and payment bonds, the Reinsurance Agreement, Endorsement No. 1, the Administration Agreement, Endorsement No. 2; and the Report.

L.P., 949 F.2d 42, 48 (2d Cir. 1991).  When a "complaint relies heavily upon [the] terms and effect" of a document, such as a contract, it is considered "integral" to the complaint. Mangiafico, 471 F.3d at 398.  In the event that a contract extrinsic to the complaint is properly considered on a motion to dismiss, a court is "not constrained to accept the allegations of the complaint in respect of the construction of the [contract]."  Int'l Audiotext Network, Inc. v. American Telephone & Telegraph, 62 F.3d 69, 72 (2d Cir. 1995).  The court must, however, "strive to resolve any contractual ambiguities in [the plaintiff's] favor."  Id.

While Endorsement No. 3 is not attached to the original or corrected complaint or incorporated by reference in either document, it is nevertheless properly considered on the instant motion.  It is integral to the complaint in that it amends the Reinsurance Agreement, Endorsement Nos. 1 & 2, and the Administration Agreement, which are all attached to the plaintiff's complaint, by releasing NICO "from any and all claims related to the reinsurance in effect on December 31, 2003 except for the amended obligations" set forth in the endorsement.  The complaint "relies heavily upon [the] terms and effect" of these agreements, Mangiafico, 471 F.3d at 398, and consequently on Endorsement No. 3.

A. The Reinsurance Agreement and Sections 1115 and 4118

     The plaintiff contends that the Reinsurance Agreement in
conjunction with Sections 1115 and 4118 expressly provide it
with a direct cause of action against NICO and National
Liability.  It also argues that Sections 1115 and 4118 provide
it an independent cause of action to sue the defendants for
recovery on the performance and payment bonds.

     Reinsurance contracts are generally contracts of
indemnification in which a ceding insurer is indemnified by a
reinsurer against loss on its policies.  Cont'l Cas. Co. v.
Stronghold Ins. Co., Ltd., 77 F.3d 16, 19 (2d Cir. 1996).  Since
the relationship is one of indemnification, "[t]he reinsurer has
no privity with, and is generally not liable to, the original
purchaser of the underlying policy."  Travelers Indem. Co. v.
Scor Reinsurance Co., 62 F.3d 74, 76 (2d Cir. 1995); see also
Unigard Sec. Ins. Co., Inc. v. N. River Ins. Co., 4 F.3d 1049,
1054 (2d Cir. 1993).  As a result, even where the reinsured
party is insolvent, "the insured is not considered a third party
beneficiary of reinsurance policies."  Mercantile & Gen.
Reinsurance Co., PLC v. Colonial Assurance Co., 591 N.Y.S.2d
1015, 1017 (App. Div. 1992), rev'd on other grounds, 82 N.Y.2d
248 (1993).

     Under New York law, however, reinsurance contracts may
permit an original insured party to bring a direct action

against a reinsurer in one of several ways.  "[T]he reinsurer may agree to be directly liable to the original insured."  <u>China Union Lines, Ltd. v. Am. Marine Underwriters, Inc.</u>, 755 F.2d 26, 30 (2d Cir. 1985).  New York law permits the parties to a reinsurance agreement to include a so-called "cut through" clause, which confers upon the original insured direct rights against the reinsurer.  <u>In re Bennett Funding Corp. Sec. Litig.</u>, 270 B.R. 126, 131 (S.D.N.Y. 2001), <u>aff'd</u> 60 Fed. Appx. 863 (2d Cir. 2003); <u>Mercantile & Gen. Reinsurance Co.</u>, 591 N.Y.S.2d at 1017 ("[P]arties may draft reinsurance contracts containing specific language so that they will operate in favor of the original insured.").  These express provisions vest the insured "as the obligee of a reinsured surety bond, with a direct right of action on the agreement against the reinsurer[]."  <u>Turner Constr. Co. v. Seaboard Sur. Co.</u>, 447 N.Y.S.2d 930, 935 (App. Div. 1982) (reinsurance agreement features two provisions, one in the document and another incorporated by reference, that together vest obligee of reinsured surety bond with direct right of action against reinsurers).  To provide an insured party an independent right of action against a reinsurer, a cut through provision must be apparent on the face of an agreement.  <u>In re Bennett</u>, 270 B.R. at 131.

New York Insurance Law even mandates the inclusion of cut through provisions in reinsurance agreements when an insurer

exposes itself to a significant risk in writing a policy.

Section 1115 prohibits an insurer from issuing a surety bond for

an amount greater than 10% of its surplus to policyholders.  It

provides in pertinent part,

> Except as otherwise provided in this chapter, no insurer
> doing business in this state shall expose itself to any
> loss on any one risk in an amount exceeding ten percent of
> its surplus to policyholders. . . . "[S]urplus to
> policyholders" shall include voluntary reserves, or any
> part thereof, not required by law, and be determined from
> the <u>insurer's last sworn statement on file with the
> superintendent</u>, or the <u>last report on examination</u> filed by
> the superintendent, whichever is more recent <u>at the time
> the risk is assumed</u>.

N.Y. Ins. Law § 1115 (emphasis supplied).  Section 4118

nevertheless permits companies to expose themselves to surety

risks greater than the ten percent threshold established in

Section 1115 as long as they secure reinsurance in an agreement

that protects surety bond holders by permitting them to sue the

reinsurer of the bond.  Section 4118 provides in pertinent part,

> [t]he net amount of exposure on any one fidelity or surety
> risk shall, except as provided in paragraph four hereof, be
> deemed within the limit of ten percent <u>if the company is
> protected in excess of that amount by</u>:
>
> > (A) reinsurance in a company authorized to write such
> > business in this state or reinsurance in an accredited
> > reinsurer, . . .  <u>which is in such form as to enable
> > the obligee or beneficiary to maintain an action
> > thereon</u> against the ceding insurer jointly with the
> > assuming insurer or, where the commencement or
> > prosecution of actions against the ceding insurer has
> > been enjoined by any court of competent jurisdiction
> > or any justice or judge thereof, <u>against the assuming
> > insurer alone, and to have recovery against the</u>

<u>assuming insurer for its share of the liability</u>
<u>thereunder and in discharge thereof</u>.

N.Y. Ins. Law § 4118(a)(1) (emphasis supplied).  Thus, together

Sections 1115 and 4118 prohibit a New York insurer from issuing

a surety bond for an amount greater than 10% of its surplus to

policyholders without entering into a reinsurance agreement

containing an enforceable cut through provision.

The complaint does not specifically allege that the

Reinsurance Agreement contains express language creating a "cut

through" permitting it to sue NICO directly for claims on

Frontier-issued bonds.  In its briefs, the plaintiff contends

that Article 1 of the agreement contains a cut through clause.

That article provides that "the parties to this Reinsurance

intend that Reinsurer, through the Claims Administrator, shall

pay all amounts of the Ultimate Net Loss due Insureds and other

persons as and when due directly on behalf of the Reinsured."

The plaintiff claims that this provision trumps Article 14 of

the agreement, which explicitly denies third party beneficiary

rights to insureds.

"Under New York law, the meaning of a contract that is

unambiguous is a question of law for the court to decide."

<u>Revson v. Cinque & Cinque, P.C.</u>, 221 F.3d 59, 66 (2d Cir.

2000)(citation omitted).  The determination of whether a term in

a reinsurance contract is ambiguous is a "threshold question of

law for the court." British Int'l Ins. Co. Ltd. v. Seguros La Republica, S.A., 342 F.3d 78, 82 (2d Cir. 2003) (citation omitted). New York law also holds that "the contra proferentem rule that is sometimes used in the context of direct insurance," by which insurance contracts are construed against the insurer, does not apply. Id. at 81. "Reinsurers are so dependent upon ceding insurers for information, that application of a canon construing the reinsurance contract against the reinsurer would be highly anomalous." Id. at 82 (citation omitted).

The Reinsurance Agreement does not provide the plaintiff a direct cause of action against NICO. The payment directions in Article 1 are not a cut through clause, and the contract itself explicitly excludes third party beneficiary rights.[8] "Under New York law, the effectiveness of a negating clause to preclude third-party beneficiary status is well-established: where a provision exists in an agreement expressly negating an intent to permit enforcement by third parties, that provision is decisive." India.Com, Inc. v. Dalal, 412 F.3d 315, 321 (2d Cir. 2005) (citation omitted).

---

[8] Article 1 bears no similarity to cut through clauses recognized by other courts. See, e.g., Turner, 447 N.Y.S.2d 930, 932 (reinsurance agreement incorporated provision stating that "[t]his Agreement shall be deemed to comply with any law, whenever applicable, which provides that the Obligee or other beneficiary of the Bond shall have the right to maintain an action on such an agreement against the Reinsurer.")

Nor do Sections 1115 and 4118 provide the plaintiff a direct cause of action absent express language in the Reinsurance Agreement itself.  These provisions simply indicate that in order to issue a surety bond in excess of Section 1115's ten percent threshold, an insurer must secure reinsurance for the requisite amount through an agreement containing a cut through clause.  In certain circumstances, therefore, Section 4118 may require a reinsurance agreement to contain a cut through provision.  See, e.g., Liquidation of Union Indemnity Ins. Co. of N.Y. v. Am. Centennial Ins. Co., 89 N.Y.2d. 94, 109 (1996).  Neither Section 1115 nor 4118, however, establishes an independent, statutory cause of action in the event that a reinsurance agreement fails to contain a cut through clause. Jurupa has not, moreover, even pleaded facts sufficient to pursue this point since Frontier and NICO entered into the Reinsurance Agreement months after Frontier issued the performance and payment bonds.[9]

---

[9] In the absence of an express cut through clause, an insured may still have a direct cause of action against a reinsurer based on the latter's conduct, such as when the original insured consistently deals directly with the reinsurer, bypassing the original insurer.  Allstate Ins. Co., v. Administratia Asigurarilor De Stat, 948 F. Supp. 285, 307-08 (S.D.N.Y. 1996). Such situations, however, are "rare."  Id. at 308.  The mere fact that a reinsurer pays claims on behalf of the insurer does not necessarily alter the relationship between the reinsurer, insurer, and insured, since in such a case, "the reinsurer is only the vehicle used by the insurer to pay the claim. . . ." Reliance Ins. Co. v. Aerodyne Eng'rs Inc., 612 N.Y.S.2d 87, 88

The plaintiff's reliance on Turner, 447 N.Y.S.2d 930, and Trans-Resources, Inc. v. Nausch Hogan & Murray, 746 N.Y.S.2d 701 (App. Div. 2002), is unavailing.  In Turner, the Appellate Division relied on specific provisions of a reinsurance agreement to find that the agreement vested the surety-bond holder "with a direct right of action on the agreement against the reinsurers."  Turner, 447 N.Y.S.2d at 935.  The reinsurance agreement in Turner was in place at the time the performance bond was issued, and incorporated a standard form reinsurance agreement which allows a beneficiary a direct right of action against the reinsurer when deemed necessary to comply with the jurisdiction's law.  Id. at 932.  The Turner court did not find, as plaintiff contends, that a cut through clause will be inserted as a matter of law into a reinsurance agreement if necessary to comply with Section 1115 in the absence of contractual language supporting that interpretation.  Where, as here, the reinsurance agreement does not contain an express cut through clause, Sections 1115 and 4118 may not be read to impose one.

Nor may the plaintiff rely on Trans-Res., 746 N.Y.S.2d 701, for support.  Trans-Res. held that summary judgment in favor of a reinsurer contesting direct liability to an insured party

_____

(App. Div. 1994).  The plaintiff has not pled that through its conduct alone, NICO maintained a relationship with Jurupa sufficient to sustain direct liability.

should not have been entered where there was evidence that the underwriter, not the reinsurer, was to work out the details of the reinsurance agreement at a later date, and the parties had agreed that the agreement would contain a cut through clause. Id. at 706.  Here, the reinsurance agreement was executed, did not contain a cut through clause, and expressly excluded third party beneficiary rights.  Finding that the Reinsurance Agreement and New York Insurance Law Sections 1115 and 4118 fail to provide the plaintiff a direct cause of action against NICO, plaintiff's first claim is dismissed as a matter of law.


B. Assumption and Breach of Contract

     Jurupa also claims that NICO assumed Frontier's liabilities when it entered the Reinsurance Agreement, and that it has breached that contract by failing to pay Jurupa.  Under New York law, "[t]o make out a viable claim for breach of contract a complaint need only allege (1) the existence of an agreement, (2) adequate performance of the contract by the plaintiff, (3) breach of contract by the defendant, and (4) damages."  Eternity Global Master Fund Ltd. v. Morgan Guar. Trust Co. of N.Y., 375 F.3d 168, 177 (2d Cir. 2004) (citation omitted).

The plaintiff alleges in effect that the Reinsurance Agreement between NICO and Frontier constitutes assumption reinsurance rather than indemnification insurance.  In an assumption reinsurance agreement,

> the reinsurer steps into the shoes of the ceding company with respect to the reinsured policy, assuming all its liabilities and its responsibility to maintain required reserves against potential claims.  The assumption reinsurer thereafter receives all premiums directly and becomes directly liable to the holders of the policies it has reinsured.

Colonial Am. Life Ins. Co. v. Comm'r of Internal Revenue, 491 U.S. 244, 247.  Jurupa points to Article 1 of the agreement for support, which provides that NICO "shall pay all amounts . . . due Insureds and other persons as and when due directly on behalf of the Reinsured in according with Article 16," (emphasis added), and alleges that NICO "agreed to make direct payments to policyholders and other third-party claimants, without the need for Frontier to make payments as intermediary."  Without pointing to specific language in the agreements, Jurupa also alleges that NICO assumed direct liability by agreeing to reinsure Frontier on outstanding surety bond risks in Endorsement No. 1, and agreeing that its "corporate affiliate would handle claims administration responsibilities for claims under the covered surety bonds" in the Administration Agreement.

The plaintiff has failed to identify any provision in the Reinsurance Agreement, the Administration Agreement, or the

endorsements that creates an agreement of assumption rather than indemnification.  The provisions of the Reinsurance Agreement on which it relies concern payment logistics and not the assumption of liabilities.  Nor has it directed attention to any amendment of that agreement through the Administration Agreement or Endorsements Nos. 1-3 in which NICO assumed liability. Moreover, Endorsement No. 3 entirely eliminated NICO's obligations -- whether they were obligations to assume or indemnify -- with respect to Frontier-issued surety bonds.[10]  The plaintiff has therefore failed to state a claim against NICO for assumption and breach of contract as a matter of law.


C. Tortious Interference with a Contract

     Plaintiff has sued National Liability for tortious interference with a contract.

> Under New York law, the elements of a claim for tortious
> interference with a contract are (1) the existence of a
> valid contract between the plaintiff and a third party; (2)
> the defendant's knowledge of the contract; (3) the
> defendant's intentional procurement of the third-party's
> breach of the contract without justification; (4) actual
> breach of the contract; and (5) damages resulting
> therefrom.

---

[10] The state court-approved agreement between NICO and Frontier to commute NICO's reinsurance obligation is presumed to signify that court's adoption of Endorsement No. 3.  The parties have not suggested a different conclusion.

Kirch v. Liberty Media Corp., 449 F.3d 388, 401 (2d Cir. 2006) (citation omitted).  A court may dismiss a tortious interference claim where the plaintiff has failed to demonstrate the existence of a "valid, enforceable contract," which is a "central requirement" of this cause of action.  Scutti Enters., LLC v. Park Place Entm't Corp., 322 F.3d 211, 215 (2d Cir. 2003).

The plaintiff has alleged that NICO "assumed direct obligations" under the surety bonds.  It also contends that National Liability[11] handles claims administration responsibilities for claims under the bonds pursuant to the Administration Agreement and Endorsement No. 2, and that it "intentionally interfered" with NICO's performance under the surety bonds through its claims administration.  Finding that the plaintiff lacks privity with NICO under the surety bonds, the plaintiffs have failed to state a claim against National Liability for tortious interference with a contract.

---

[11] In the paragraph setting forth its claim for tortious interference with a contract, the complaint mistakenly identifies Frontier as opposed to National Liability as the claims administrator.

CONCLUSION

The defendants' motion to dismiss for failure to state a claim is granted.  The Clerk of Court shall close this case.

SO ORDERED:

Dated:    New York, New York
          June 29, 2007

_____
DENISE COTE
United States District Judge

27